observed PITO exit the SANTIAGO minivan, clutching a shiny object in his left hand. PITO walked back to join SANTIAGO where Special Agent Coletti observed both enter 427 Rosewood Lane. At approximately 6:28 p.m., Special Agent Coletti observed SANTIAGO exit 427 Rosewood Lane. Based upon the interceptions and surveillance, I believe that SANTIAGO and PITO did meet to conduct the 50 gram heroin purchase.

**Heroin deliveries to SANCHEZ at 270 Fairmont Street, Fitchburg, MA**

72. On August 18, 2004 at approximately 3:16 p.m., an incoming call to SANTIAGO was intercepted. During the ensuing coded conversation SANCHEZ asked SANTIAGO if they would be able to see each other that night. SANTIAGO replied in the affirmative. SANCHEZ asked if they could meet after 8:00 p.m. SANTIAGO wanted SANCHEZ to be ready because he didn't want to wait. SANTIAGO asked SANCHEZ how much the "car part cost." SANCHEZ replied that "it's pretty cheap, $250.00." SANTIAGO advised SANCHEZ to be ready after 8:00 p.m. and that SANTIAGO would pick SANCHEZ up. At approximately 8:10 p.m., SANCHEZ called SANTIAGO on Target Telephone 1 and asked if SANTIAGO could wait 40 more minutes before going to pick SANCHEZ up. SANTIAGO agreed.

73. At approximately 9:30 p.m., Special Agent Willoughby observed SANTIAGO leaving his address at 264 Mechanic Street in the SANTIAGO minivan. At approximately 9:45 p.m. TFA Swift observed SANTIAGO parking the SANTIAGO minivan in front of SANCHEZ's 270 Fairmont Street residence. SANTIAGO exited his vehicle and was observed walking up the steps toward 270 Fairmont Street. At approximately 10:18 p.m. TFA Swift observed SANTIAGO leaving the area of SANCHEZ'S 270 Fairmont Street accompanied by a second Hispanic male wearing a long sleeved white button down shirt. SANTIAGO walked directly to his vehicle while the other Hispanic male looked in both directions up and down Fairmont Street.

74. Based upon numerous intercepted conversations previously mentioned in this affidavit in which SANTIAGO uses monetary amounts or car parts as code for quantities of heroin, I believe the above coded conversation and subsequent surveillance indicates that SANCHEZ ordered 250 grams of heroin from SANTIAGO and that SANTIAGO then delivered the heroin to

31

SANCHEZ at SANCHEZ's 270 Fairmont Street.

75.     In an October 1st call on Target Telephone 3 at approximately 5:34 p.m., SANTIAGO received a call from SANCHEZ. In this call, SANCHEZ asked if he could meet with SANTIAGO the following day. SANTIAGO asked if everything was fine. SANCHEZ indicated that it was and that it was for "Primo." SANTIAGO told SANCHEZ to call his pager and put the time that they were going to meet as a message. I believe that SANTIAGO's instruction to SANCHEZ "to put the time that they were going to meet" into the pager was code asking SANCHEZ to page him with the quantity of drugs that he wanted. At approximately 11:51 a.m. the following day (October 2nd), there was an intercepted call from SANTIAGO on Target Telephone 3 to SANCHEZ. SANTIAGO asked SANCHEZ if he had called SANTIAGO. SANCHEZ said no. SANTIAGO asked SANCHEZ if he needed a ride. SANCHEZ replied that he didn't know yet. SANTIAGO told SANCHEZ to let him know.   At approximately 3:53 p.m on October 2nd, the Target Pager received a "50" page which I believe was code for a 50-gram quantity of heroin made by SANCHEZ.   Later on October 2nd at approximately 6:57 p.m., SANTIAGO called SANCHEZ and asked him if he was home. SANTIAGO asked him to open the door for him.  Surveillance observed SANTIAGO 's minivan at SANCHEZ's residence at 270 Fairmount Street, Fitchburg, Massachusetts at and around this time. Based upon the interceptions and surveillance, the agents believe that SANCHEZ contacted SANTIAGO on October 1st and 2nd to purchase a 50-gram quantity of heroin and that SANTIAGO delivered same to SANCHEZ at his residence on October 2nd.

76.     On October 7, 2004 at approximately 11:51 a.m., SANTIAGO using Target Telephone 3 called SANCHEZ. SANTIAGO told SANCHEZ to tell him because he was going. SANCHEZ said yes and that he forgot to call SANTIAGO.   SANCHEZ explained that he was waiting for his cousin, but he didn't bring it. SANTIAGO told SANCHEZ to forget about him then and told SANCHEZ to page him with the time that they are going to meet. A few minutes later, at approximately 11:55 a.m., SANTIAGO on Target Telephone 3 received a call from SANCHEZ. SANCHEZ told him "it's the two." SANTIAGO indicated that he did not understand and asked if

"the two guys are going there" which SANCHEZ then confirmed. SANTIAGO then told SANCHEZ that he received the call. At approximately 11:59 a.m., there had been a page of "250" to the Target Pager. Based upon the interceptions and the investigation to date, I believe that SANTIAGO was going to retrieve or obtain a quantity of heroin for SANCHEZ but was waiting for SANCHEZ's order; SANCHEZ indicated that he was waiting for someone ("his cousin") to bring the money for the drug transaction; and SANTIAGO told him to page him with the "time" (meaning the quantity of heroin that he wanted). SANCHEZ called back and indicated "it's the two" (meaning a quantity of heroin for him and "his cousin"). SANTIAGO's acknowledgment that he had received the call was a reference to the "250" page that he had received via the Target Pager (meaning that SANCHEZ wanted 250 grams of heroin).

### Heroin sales from SANTIAGO to AGOSTO

77.    On July 1, 2004 at approximately 4:34 p.m., an incoming call to SANTIAGO from AGOSTO was intercepted over Target Telephone 2. During the intercepted coded conversation AGOSTO asked SANTIAGO if SANTIAGO could pay AGOSTO a visit. They agreed to meet early the next day. SANTIAGO asked AGOSTO how much he needed. AGOSTO replied "sixty." SANTIAGO asked if it was only 60 pesos. AGOSTO replied in the affirmative. SANTIAGO asked AGOSTO to get it from the same "money order." SANTIAGO said that it was all going to be in the same money order and that they would talk later on. SANTIAGO advised AGOSTO that he would call him later that night.

78.    At approximately 4:49 p.m. on that same date another incoming call to SANTIAGO from AGOSTO was intercepted over Target Telephone 2. During that conversation AGOSTO told SANTIAGO that 'this one" called him and asked if SANTIAGO could get "him" an additional "money order" for $16.00. SANTIAGO asks if the $16.00 was separate from the $60.00 "money order." AGOSTO replied in the affirmative. They agreed that SANTIAGO would call AGOSTO at 6:00 a.m. the following day July 2, 2004.

79.    On July 2, 2004 at approximately 7:46 a.m., an incoming call to SANTIAGO from AGOSTO was intercepted over Target Telephone 2. During that call SANTIAGO asked AGOSTO

33

if he was ready to go to the "beach." SANTIAGO told AGOSTO to get ready because SANTIAGO is waiting for AGOSTO to go to the "beach." SANTIAGO instructed AGOSTO to take the right amount of money for the "parking." SANTIAGO insisted that AGOSTO calculate how much and bring the right amount of money.

80.    On July 2, 2004 at approximately 7:47 am Sgt James Trudell observed SANTIAGO exit the second floor left side apartment, of 264 Mechanic Street as viewed from 7th Street. Sgt Trudell then observed SANTIAGO drive out of the driveway of 264 Mechanic Street in the SANTIAGO minivan. Surveillance officers then followed SANTIAGO directly to Lowell where surveillance lost him in the area of the River Place apartment complex at approximately 8:20 a.m. At approximately 8:15 a.m. an outgoing call from SANTIAGO to AGOSTO was intercepted over Target Telephone 2. During that call SANTIAGO told AGOSTO he was about to leave town. AGOSTO asked SANTIAGO to meet him at Josefina's house, AGOSTO's little sister. During further conversation SANTIAGO told AGOSTO to start walking over there. Surveillance was able to locate SANTIAGO at approximately 9:05 a.m. He was alone and was not observed traveling to the beach.

81.    Based upon SANTIAGO's practice of using monetary amounts as a code to describe quantities of heroin, I believe that in the July 1, 2004 calls, AGOSTO placed two coded orders for heroin with SANTIAGO; one order for 60 grams of heroin followed by another order for 16 grams of heroin. On July 2, 2004, SANTIAGO then delivered the 76 grams of heroin to AGOSTO in Lowell , Massachusetts.

82.    On October 9, 2004, there were a series of calls and pages to the Target Telephone 3 and Target Pager between AGOSTO and SANTIAGO. In one of these calls, SANTIAGO told AGOSTO to put the phone number and the "time" (meaning the quantity of heroin he wanted to buy) on the "card" (meaning the Target Pager) and that they would meet later. About thirty-five minutes later, the Target Pager received a "9369-100" which is the last four digits of a telephone number used by AGOSTO and I believe that "100" refers to a 100-gram order of heroin. At 7:19 p.m, the Target Pager received a page of "978-397-0840-100" which is a phone number used by RODRIGUEZ and

34

I believe that "100" refers to a 100-gram order of heroin. SANTIAGO tried to reach AGOSTO at various numbers including the number above, but to no avail. Then, at approximately 7:23 p.m., SANTIAGO called RODRIGUEZ at 978-397-0840.[8]   In the course of conversation, Rodriguez agreed "when the guy has the luggage (meaning money for heroin) ready to call him (meaning SANTIAGO)." SANTIAGO further instructed Rodriguez to have him (AGOSTO) call him (meaning SANTIAGO) as soon as possible. At approximately 8:02 p.m., SANTIAGO called the same number on which he previously talked to RODRIGUEZ and talked to AGOSTO. SANTIAGO asked AGOSTO what his problem was. AGOSTO said that he had the "suitcases" (meaning the money). At approximately 8:45 p.m., surveillance agents observed the SANTIAGO minivan around the corner from TAVO's residence. In a 9:04 p.m. call from SANTIAGO to the same phone number, SANTIAGO again spoke with AGOSTO. SANTIAGO indicated that he had to go and AGOSTO said that he was on his way there (meaning to meet SANTIAGO at TAVO's residence). SANTIAGO asked him if "the guy" (meaning Jose Rodriguez) was giving him a ride to which AGOSTO responded no. SANTIAGO said that "it is not at your sister's house you hear." AGOSTO acknowledged that he knew this (indicating that he knew that they were going to meet at TAVO's residence). Surveillance observed AGOSTO arrive and walk down the street toward 212 Wilder Street. At approximately 9:27 p.m., SANTIAGO called the same phone number again. AGOSTO said that he was there and SANTIAGO told AGOSTO that he should come on up (meaning he should come on up to TAVO's apartment that is located on the second floor).

**SANTIAGO'S Drug Transactions With TORREZ**

Mini Self-Storage, 3 Foundry Street, Lowell, MA

83.      On June 30, 2004 at about 10:12 a.m., SANTIAGO placed an outgoing call on Target Telephone 2 to TORREZ at 978-265-0079. SANTIAGO told TORREZ if he needs to go, SANTIAGO would go down "there." TORREZ said yes. TORREZ then told SANTIAGO to take

---

[8]Law enforcement officers had previously seized 60 grams of heroin from RODRIGUEZ's person and his residence on June 6, 2004 after a delivery of SANTIAGO as discussed above.

2 of the "good ones for Taylor". SANTIAGO replied they will meet 'over there' and to answer the call. I believe SANTIAGO was going to deliver 2 fingers of heroin to TORREZ.

84.        Based upon the above intercepted conversation, surveillance was stationed at SANTIAGO'S 264 Mechanic Street residence as well as TORREZ's 219 Black Brook Drive residence. At about 11:15 a.m., Sgt. Trudel observed an Hispanic male exit the area of TORREZ'S 219 Black Brook Drive residence and enter a white Dodge Caravan. He left the area. At about 11:20 a.m. surveillance observed SANTIAGO get into the SANTIAGO minivan and drive to Foundry Street, Lowell, MA. He parked the vehicle and entered a set of double white doors at the Mini Self Storage, 3 Foundry Street, Lowell, MA. Several minutes later SANTIAGO exited the storage facility, opened the front passenger door of the blue van and then re-entered the storage facility. At about 12:07 p.m. SANTIAGO and another Hispanic male simultaneously exited the storage facility. SANTIAGO entered the SANTIAGO minivan while the other male entered a white Caravan, subsequently identified as the same white van Sergeant Trudel had observed leaving Black Brook Drive at 11:15 a.m. Both vans departed the area moments later.

85.        On August 19, 2004 at 6:48 p.m. TORREZ called SANTIAGO on Target Telephone 1 but only received Santiago's voicemail. TORREZ left a message asking SANTIAGO to call 'Tim' back because he is leaving on Friday and needed the "title." On August 19, 2004 at 7:21 p.m. SANTIAGO called TORREZ back at 978-265-0079. SANTIAGO apologized to 'Tim' (TORREZ) for not answering TORREZ' call but he was far away. SANTIAGO said he will call TORREZ when he got home. TORREZ told SANTIAGO that he needed "that" because he was going to play down there. SANTIAGO asked if that will be tomorrow afternoon. TORREZ said after five. SANTIAGO said he would call TORREZ early the next day. On August 20, 2004, SANTIAGO receives an incoming call on Target Telephone #1 from TORREZ. SANTIAGO told TORREZ, (Tim), he had been "working." SANTIAGO tells TORREZ he would go to TORREZ'S location around 2 or 3:00. TORREZ reminded SANTIAGO he was leaving at 5:00. SANTIAGO assured TORREZ he would be there long before that. On August 20, 2004 at 2:29 p.m., SANTIAGO called TORREZ. SANTIAGO asked where TORREZ was and then told him to wait for him "there."

36

86.        Based upon the above intercepted telephone conversations surveillance was established at about 2:30 p.m. at the Mini Self-Storage, 3 Foundry Street, Lowell, MA. Upon arrival, Sgt Trudell advised surveillance that two Hispanic males were present at that location. From prior surveillances Sgt. Trudell identified one of the Hispanic males as Edwin TORREZ of 219 Black Brook Drive, Lowell, MA. He observed both TORREZ and the unidentified Hispanic male to be standing by TORREZ'S white Dodge Caravan. (Prior surveillances had observed TORREZ operating the same white Caravan.) At about 2:58 p.m., surveillance agents observed SANTIAGO arrive in the front of the Mini Self-storage, park and exit his van. Surveillance observed that upon exiting his van, SANTIAGO was holding an unknown object in his left hand. SANTIAGO was seen by surveillance meeting with TORREZ and the unknown Hispanic male outside the building where they shook hands. A short time later SANTIAGO and TORREZ were seen by surveillance entering the storage building. The unknown Hispanic male remained outside sweeping. At about 3:03 p.m., surveillance agents observed a 1995 black Hyundai arrive in the parking lot of the self-storage. An individual later identified as PITO, was driving. PITO got out of the Hyundai carrying four Dunkin Donuts coffee cups. PITO entered the same storage building as SANTIAGO and TORREZ. The unknown Hispanic male continued sweeping outside. At about 3:10 p.m., surveillance agents observed PITO enter the Hyundai. At about 3:19 p.m., the unknown Hispanic male and TORREZ were seen getting into the white Caravan. They got out of the van shortly thereafter. At about 3:54 p.m., surveillance observed SANTIAGO return to the SANTIAGO minivan and depart the area. At about 3:59 p.m., surveillance agents followed PITO in the black Hyundai and the white Caravan out of the area of the Mini Self-Storage facility.

87.        On September 1, 2004 at 4:20 p.m., SANTIAGO received an incoming call on Target Telephone 1 from Edwin TORREZ. They exchanged greetings and asked each other why the other had not called. SANTIAGO then asked TORREZ if he should go to the "registry" tomorrow morning to meet up with TORREZ. SANTIAGO asked TORREZ if he should bring TORREZ the "car" and TORREZ said yes. SANTIAGO told TORREZ that the two will talk in the morning. In this call, SANTIAGO used the same coded terminology that he used on June 7, 2004

37

at 6:27 p.m. when he told TORREZ he left $16 with TORREZ to take to the registry. In both instances, I believe SANTIAGO was using the word 'registry' as code for delivering heroin to TORREZ

88.      On September 2, 2004 at 5:53 p.m., TORREZ called SANTIAGO on Target Telephone 1. SANTIAGO asked TORREZ if he wanted to go the "game" in Boston. TORREZ said that his buddy was "practicing" now. SANTIAGO said he thought TORREZ was supposed to go 'there' today. TORREZ asked SANTIAGO if SANTIAGO is coming down now and SANTIAGO said he was waiting for 'that.' SANTIAGO said that he'll have to come down on Sunday or Saturday. TORREZ asked SANTIAGO where they were going to meet if SANTIAGO went today since "that place up there is bad." SANTIAGO asked if there isn't any parking and TORREZ said no. SANTIAGO said he'll call TORREZ when he is around the area. I believe this conversation is about SANTIAGO and TORREZ discussing whether SANTIAGO is going to deliver to TORREZ today and where. I believe the bad place they are talking was the Mini Self-Storage facility on Foundry Street, Lowell, MA.

89.      On September 2, 2004 at 7:03 p.m. SANTIAGO received an incoming call from TORREZ on Target Telephone 1. SANTIAGO told TORREZ that he was waiting for him near the houses where SANTIAGO put the (unintelligible) the last time. SANTIAGO asked if TORREZ remembered and TORREZ affirmed. TORREZ said that he'll come down now and call SANTIAGO. SANTIAGO told TORREZ to come down as soon as possible as he is at someone else's house and he has to leave.

90.      On September 2, 2004 at 7:23 p.m., SANTIAGO received an incoming call from TORREZ on Target Telephone 1. TORREZ asked SANTIAGO if he was there and SANTIAGO said yes, he was still waiting for TORREZ. TORREZ asked if SANTIAGO could come down to TORREZ'S location. SANTIAGO said no, he didn't like it there. TORREZ said that's fine and he'd come up now to meet SANTIAGO. SANTIAGO told TORREZ to hurry as his friend and wife have to leave. At 7:43 p.m., TORREZ called SANTIAGO and told SANTIAGO he was there. SANTIAGO told TORREZ to come in as the guy is working on the "car."

38

91.    On September 2, 2004, surveillance was established at 212 Wilder Street, Lowell, MA, TAVO'S residence. At about 7:47 p.m. surveillance observed TORREZ'S white Dodge Caravan arrive and park in the driveway of TAVO'S 212 Wilder Street residence. At about 8:08 p.m., surveillance agents observed 2 Hispanic males leaving 212 Wilder Street in the Dodge Caravan. While SANTIAGO was at 212 Wilder Street, TAVO was in the driveway sweeping. When TORRADO arrived and left 212 Wilder Street, TAVO was sweeping the driveway and continued even after TORRADO left. When TORREZ arrived at TAVO'S 212 Wilder Street residence, TAVO was sweeping the driveway, and he continued after TORREZ left the area. It is my belief that TAVO was outside in his driveway sweeping with no purpose other than maintaining surveillance for SANTIAGO'S drug transactions.

### SANTIAGO's Delivery of 10 Grams of Heroin to TORRADO

92.    At approximately 4:41 p.m. on August 26, 2004, SANTIAGO received an incoming call on Target Telephone 1 from TORRADO at 978-479-2026, listed in TORRADO'S name at 4 Florence Ave., Lowell, Massachusetts. During this intercepted conversation, TORRADO told SANTIAGO he had been waiting for SANTIAGO'S call. TORRADO told SANTIAGO they didn't have to do "it" right now, that it could be later. SANTIAGO asked TORRADO "how many guys are going to go up to the park." TORRADO said "only one right now but that on Saturday, maybe 4 or 5 want to go up." SANTIAGO asked if this guy's friends are going to go over there. TORRADO said he didn't know but he'll call over "there" and find out. SANTIAGO said yes, because he did not want to make a trip and spend gas for no one to go. I understood this conversation to mean that TORRADO wanted one 'finger' of heroin (ten grams) at present but would possibly want 4-5 fingers on Saturday. Based upon previous seizures (see paragraphs 29-37 above), when SANTIAGO refers to "guys", he is talking about 'fingers' of heroin. Pertaining to TORRADO'S friends, SANTIAGO wanted to know if anyone else needed anything while he was meeting with TORRADO because his past actions show that when he travels to Lowell, he distributes to several people.

93.    At approximately 4:48 p.m. on August 26, 2004, SANTIAGO received another

incoming call on Target Telephone 1 from TORRADO (978-479-2026).    TORRADO told

SANTIAGO "he does not need workers for today." TORRADO asks SANTIAGO to "bring him two

of the last workers that this guy had, the jews."     I interpret this conversation to mean that

TORRADO changed his original order of 1 'finger' to 2 'fingers.' At 6:17 p.m. on August 26, 2004,

SANTIAGO received an incoming call from TORRADO.  SANTIAGO told TORRADO to go

where TORRADO'S wife's grandmother used to live, then go into the first parking lot and he'll find

SANTIAGO'S car there.  SANTIAGO tells TORRADO "he'll find the coffee in a garbage bag in

the garbage." TORRADO asked if the 'office' was there. SANTIAGO said "yes." SANTIAGO told

TORRADO he could see it from where he was.  At 6:18 p.m., SANTIAGO placed an outgoing call

to TORRADO.  SANTIAGO asked if TORRADO found "it."  TORRADO said yes, "he found a

coffee one." SANTIAGO asked if TORRADO "left the car papers there." TORRADO said he "left

the papers under the driver's seat of Santiago's car, that he put it in a little hole in the corner."

TORRADO asked if there is 1 or 2 and SANTIAGO said TORRADO told him one.  TORRADO

told SANTIAGO he told him 2.  SANTIAGO said "he owes him the other one and that he'll give

it to him early tomorrow morning."  SANTIAGO told TORRADO he can't go 'there' again.

TORRADO said he already had 'them' reserved for someone.  I understood these conversations to

mean that SANTIAGO left the 'finger' of heroin in a garbage bag in his van(office).  After

confirming that TORRADO found the heroin, SANTIAGO asked if TORRADO left the money.

TORRADO then explained to SANTIAGO where he put the money.

94.    Based upon the above succession of conversations, as well as others throughout the

day, surveillance was established on SANTIAGO at 5:57 p.m. on Foundry Street, Lowell,

Massachusetts.  SANTIAGO was followed to the area of Black Brook Drive and Rosewood Lane,

Lowell, Massachusetts where he parked in the "Redwood Terrace" housing complex. He was seen

by surveillance agents getting out of the van and entering 427 Rosewood Lane (subsequently

identified as the residence of PITO).  At about 6:19 p.m., surveillance observed TORRADO enter

Rosewood Lane in a white 1993 Buick sedan.  TORRADO parked his vehicle next to the

SANTIAGO minivan and exited. TORRADO then entered Santiago's van on the driver's side where

40

he stayed for about 20 seconds. TORRADO was observed by surveillance agents exiting Santiago's mini-van carrying a white coffee cup. He returned to his vehicle where he remained for about 1 minute before departing the area.

95.    TORRADO was followed by surveillance agents through Lowell, Massachusetts. It became apparent to surveillance agents that TORRADO became aware of surveillance following him as his speed increased and he made several quick turns to evade them. TORRADO was stopped at about 6:31 p.m. by a uniformed Lowell Police Department officer. While TORRADO was being questioned, Detective Figueroa of the Lowell Police Department observed Reynaldo RIVERA drive by TORRADO. A search of TORRADO and his vehicle were performed with negative results. TORRADO was released. Detective Figueroa retraced TORRADO'S route prior to being stopped and located a McDonald's coffee cup which contained a hard cylinder object wrapped in gray duct tape further containing compacted tan powder. The tan powder was later field tested which generated a positive reaction for heroin.

96.    At 6:36 p.m. on August 26, 2004, SANTIAGO, utilizing Target Telephone 1, called RIVERA on the Rivera cell phone. RIVERA told SANTIAGO that "there were problems with the 'car' and to be careful not to come around." SANTIAGO asked what RIVERA meant by problems. RIVERA again told SANTIAGO not to go by, otherwise "he may end up on foot." RIVERA told SANTIAGO "the car stalled." SANTIAGO asked if he meant the "guy" and RIVERA said yes. SANTIAGO asked when this happened and RIVERA said "just now but that the guy is okay, didn't get hurt." SANTIAGO asked if the guy is okay. RIVERA said yes, but "the guy ended up on foot." SANTIAGO said he still did not understand RIVERA but it was okay. At 8:06 p.m. SANTIAGO called RIVERA and asked if "this guy" is fine. RIVERA said he was fine but that he lost the "car." RIVERA said he was with 'him' and that everything went well. SANTIAGO said he was worried. RIVERA said it's something to worry about but that everything is fine. SANTIAGO asked RIVERA to have 'him' call him if anything. I interpret this call to mean RIVERA called SANTIAGO to alert him to the fact that TORRADO had been stopped. TORRADO was not arrested but he did not have the 'finger' of heroin (car).

41

97.   At 8:50 p.m. on August 26, 2004 SANTIAGO, utilizing Target Telephone 1, called TORRADO at 978-479-2026.   TORRADO told SANTIAGO he had an 'accident' and if SANTIAGO knows what he's talking about. TORRADO told SANTIAGO that the accident was on Broadway Street. TORRADO did not understand how come it happened. SANTIAGO asked if TORRADO passed a red traffic. TORRADO said he saw them in the middle of Wilson Street and they started following him. SANTIAGO said the black car was right behind TORRADO when TORRADO was coming in.   TORRADO said he had never seen that car.   SANTIAGO told TORRADO the black car was there when TORRADO went to get the "papers." SANTIAGO told TORRADO that he was not going there anymore because "Rey" had told him that further down there is a guy who owns a 'garage' and they are crazy to close the garage. TORRADO cannot understand how that happened and that he never liked that area. SANTIAGO told TORRADO that he moved from the other 'garage' because it was even more dangerous. TORRADO kept saying that he never had an accident before, never.   TORRADO is wondering how that could have happened. SANTIAGO said he's surprised and shocked and complained about his guy having him go to his house. TORRADO told SANTIAGO to be careful with who SANTIAGO deals because maybe that guy is a rat. SANTIAGO said that they have to check it out. SANTIAGO said he doesn't think it was the guy because then PITO would be hurting himself too.

98.   On August 27, 2004 at 12:33 p.m. SANTIAGO received an incoming call on Target Telephone from TORRADO, 978-479-2026. TORRADO told SANTIAGO he was kind of upset but that it was not SANTIAGO'S fault. SANTIAGO told TORRADO he'll call him back in 5 minutes. TORRADO asked SANTIAGO if they are going to be able to do "that." SANTIAGO said yes. SANTIAGO told TORRADO he will call him back. At 1:00 p.m. on August 27, 2004, SANTIAGO received an incoming call from TORRADO. SANTIAGO said he hasn't called him back because he is "fixing a car," and he would call TORRADO back as soon as he finished. TORRADO asked if SANTIAGO'S minivan is on Wilder Street, near that street where Middlesex comes out. SANTIAGO says he is not around there. At 1:18 p.m. on August 27, 2004, SANTIAGO placed an outgoing call to TORRADO. SANTIAGO apologized for lying to TORRADO earlier.

42

SANTIAGO told TORRADO he had been here for awhile.  SANTIAGO said he has been at his location all morning so TORRADO should just come by there.  TORRADO said he was going to look for a ride.  SANTIAGO said he was at the top of the stairs near the garage.

99.    At about 9:15 a.m. on August 27, 2004, surveillance was established in the vicinity of TAVO'S 212 Wilder Street residence.  At about 9:52 a.m. surveillance agents observed SANTIAGO arrive there in the SANTIAGO minivan.  SANTIAGO parked in the driveway.  At about 10:14 a.m., surveillance agents observed SANTIAGO walk up the exterior stairs to the second floor of 212 Wilder Street.  SANTIAGO placed a small brown paper bag on the chair at the top of the stairs before moving the bar-b-que grill and bending over to retrieve an item from under the grill's wheel.  SANTIAGO then picked up the brown paper bag, opened the front door to the second floor apartment using the keys and entered the apartment.  At approximately 12:57 p.m. surveillance agents observed TORRADO driving around the area of 212 Wilder Street in his silver Toyota Matrix.  At about 1:44 p.m. surveillance agents saw TORRADO walk from Burlington Street into the driveway of 212 Wilder Street.  TORRADO was seen walking up the rear exterior stairs to Pedro Alberto Miranda's (a/k/a TAVO) apartment and enter through that door.  Surveillance saw a purple Geo Tracker occupied by a female parked in the lot of an apartment complex on Burlington Street, across from 212 Wilder Street.  At about 1:55 p.m. surveillance agents observed TORRADO exit the same door he had entered earlier, walk down the stairs and out towards Wilder Street.

100.    On September 1, 2004 at 6:42 p.m. SANTIAGO received an incoming call. TORRADO spoke to SANTIAGO and told him the number he is calling from is strange because he is calling with a calling card.  TORRADO said that tomorrow is a sure thing as he just talked to the people who are going to pay him for the "tickets" for the game on Saturday.  SANTIAGO told TORRADO to call him tomorrow in the afternoon.  TORRADO added that "5 or 6 guys who want to play will go up there tomorrow."  TORRADO said he'll call SANTIAGO tomorrow to let him know for sure about these "guys."

101.    On September 2, 2004 at 4:55 p.m. SANTIAGO received an incoming call on Target Telephone 1 from 978-509-3195,  subscribed to Carmen Negron at 243 Moody Street, Lowell,

43

Massachusetts. TORRADO greeted SANTIAGO and asks if they are going to "play" today. TORRADO wants to "play" around 7:00. SANTIAGO said he'll be around there later on. TORRADO states that "five (5) guys want to play". SANTIAGO said this is good and agreed to call TORRADO. I believe TORRADO to be ordering 5 fingers of heroin (50 grams) from TORRADO. TORRADO referred to the fingers as "guys", which is the same terminology as RIVERA uses when ordering from SANTIAGO.

102.   On September 2, 2004 at 7:04 p.m. SANTIAGO placed an outgoing call to TORRADO at 978-479-2026. SANTIAGO told TORRADO that he is waiting for TORRADO at the same place where TORRADO went before.

103.   At about 6:55 p.m. surveillance agents observed SANTIAGO to be in the vicinity of TAVO's 212 Wilder Street residence. At about 7:04 p.m. surveillance saw SANTIAGO park his mini-van in the driveway of 212 Wilder Street. At approximately 7:28 p.m. TORRADO was seen by surveillance arriving and parking on Burlington Street, Lowell, MA (one block away from the Wilder Street residence). TORRADO walked to the driveway of 212 Wilder Street. At 7:37 p.m. TORRADO was observed by surveillance leaving 212 Wilder Street.

104.   On September 2, 2004 at 7:44 p.m. SANTIAGO received an incoming call from TORRADO, 978-479-2026. SANTIAGO asked TORRADO if everything is okay and TORRADO said everything is fine.

105.   During an intercepted call over Target Telephone 3 at approximately 5:21 p.m. on September 30th between TORRADO and SANTIAGO, TORRADO asked SANTIAGO if he was still alive. SANTIAGO said that he was stuck in traffic in Worcester and he would call TORRADO. SANTIAGO said that after going to a town up there then he would call TORRADO and asked him if it was for sure. TORRADO indicated that it was and that it was for other people. SANTIAGO told TORRADO to tell those people to take it easy. TORRADO replied that he had been waiting all day. SANTIAGO replied that the afternoon was not over yet and not to worry that SANTIAGO would call TORRADO back. In a 6:18 p.m. call that SANTIAGO made to Reynaldo RIVERA, SANTIAGO asked RIVERA if "he was up in the hill." RIVERA indicated that he was and

44

SANTIAGO asked RIVERA if he could leave "some food in there for that guy." RIVERA replied that it was "no problem." A few minutes later, at approximately 6:19 p.m., SANTIAGO called TORRADO and asked if TORRADO was ready. TORRADO indicated that he was ready and SANTIAGO told TORRADO "to go up there to the hill." Right after this call, surveillance saw TORRADO as he was talking on his telephone while standing by his vehicle near his residence at 241 Moody Street, Lowell, Massachusetts. A few minutes later, SANTIAGO called RIVERA and told RIVERA to open the door.

106.    Surveillance observed SANTIAGO's minivan arrive in the area of RIVERA's residence at 235 Eighteenth Street, Dracut, Massachusetts in this time frame. Shortly thereafter, at approximately 6:33 p.m., SANTIAGO received a call from TORRADO. In this call, SANTIAGO told TORRADO that he was at the man's house. TORRADO replied that SANTIAGO had told him at the hill. SANTIAGO clarified that he meant "at the hill of your friend." TORRADO replied that he was going there. Shortly after the intercepted call with SANTIAGO, surveillance observed TORRADO leave the area of his residence on foot. Surveillance was not able to keep sight of him. Although surveillance lost sight of TORRADO, based upon the intercepted calls and the surveillance of SANTIAGO, the agents believe that TORRADO may have walked to another vehicle and driven to RIVERA's residence (which is located in an apartment complex where numerous unidentified vehicles were seen arriving in the time frame that TORRADO was expected). Based upon the sequence of calls between SANTIAGO, RIVERA and TORRADO and surveillance, I believe that TORRADO ordered a quantity of heroin from SANTIAGO for some customers ("other people") and that SANTIAGO arranged to make the delivery of the drugs to RIVERA's residence and for TORRADO to meet him there.

**SANTIAGO's Dealings with TAVO**

107.    On July 11, 2004, at approximately 5:46 p.m. SANTIAGO used Target Telephone 2 to call TAVO on Target Telephone 4. SANTIAGO asked TAVO to call TAVO's friend, because SANTIAGO "has to go over there." TAVO told SANTIAGO that his "friend" had just called.

SANTIAGO told TAVO that he was planning to go "over there," where TAVO's friend and SANTIAGO's friend were. TAVO told SANTIAGO, that he would beep (page) him and put in his "friend's" phone number, so that SANTIAGO could call TAVO's friend. SANTIAGO told TAVO to talk to TAVO's friend to make sure the latter received SANTIAGO's call. Based on cell site information for Target Telephone 2, agents knew that SANTIAGO went to New York on July 12, 2004. Therefore, in this conversation, I believe that SANTIAGO wanted to arrange to meet with TAVO's source of supply (TAVO's friend) while in New York, and that he was asking TAVO for the "friend's" number and for TAVO to let his "friend" know that SANTIAGO would be calling.

108.    On August 27, 2004, at approximately 5:51 p.m., TAVO used Target Telephone 4 to call SANTIAGO on Target Telephone 1. TAVO and SANTIAGO discussed various things. Later in the conversation, SANTIAGO told TAVO that he had gone there (to TAVO's residence) and had "left some papers" in the room that TAVO was painting. SANTIAGO told TAVO that he had done so, because TAVO had told SANTIAGO earlier that there were police around there ready to give SANTIAGO a "ticket." SANTIAGO also told TAVO that he had left TAVO's house on foot, and that the police had followed him. SANTIAGO repeated that he left the "papers" in the closet behind the stereo, behind some shoes. TAVO replied that it was "no problem" because he was going there right away. Based on my training and experience, and other intercepted conversations, I believe that when SANTIAGO said "papers," he was actually referring to drugs or drug proceeds that he had left at TAVO's house.

109.    On September 2, 2004, at approximately 5:54 p.m., SANTIAGO used Target Telephone 1 to call TAVO on Target Telephone 4. SANTIAGO told TAVO that he wanted to go there (to TAVO's location) to "fill out some papers." TAVO agreed. SANTIAGO advised TAVO that it "may take sometime." Surveillance agents observed SANTIAGO arrive at TAVO's residence at approximately 7:04 p.m. SANTIAGO remained at TAVO's residence until approximately 8:34 p.m. During this time period, SANTIAGO arranged via Target Telephone 1 for several of the other Target Subjects to meet him there, including TORRADO, TORREZ, and RODRIGUEZ. Agents were able to observe as each of these individuals came and left. They also observed TAVO in his

46

drive way looking around in a manner consistent with a look-out. Based on the investigation to date and the experience of the case agents, I believe that SANTIAGO made several narcotics sales from TAVO's residence with TAVO's knowledge, while TAVO acted as a look-out.

110.    On October 3, 2004 at approximately 2:40 p.m., TAVO (calling from 978-996-5744, a telephone that is not Target Telephone 4) called SANTIAGO on Target Telephone 3. In the course of this conversation, SANTIAGO told TAVO that he tried calling him at his number but that no one answered. TAVO replied that the phone was turned off and that he had taken the battery out and hadn't put it back in. Later in the conversation SANTIAGO told TAVO that he was there at Roger's (SANTIAGO's brother's house) near TAVO's house. TAVO asked SANTIAGO what time he was going to come by and SANTIAGO told TAVO that he was just calling to see how TAVO was doing. At the end of the conversation, TAVO told SANTIAGO that he could stop by and that TAVO had "the key to the car that he needed." SANTIAGO said that he would stop by. SANTIAGO then asked TAVO if he should call TAVO back at this same number. TAVO told SANTIAGO that he could call the other phone since TAVO was going to put the battery back in. TAVO told SANTIAGO that he could call either phone. Later that day at approximately 3:31 p.m., SANTIAGO (on Target Telephone 3) called TAVO on Target Telephone 4. In the course of this conversation, it was clear that the two were planning to meet. SANTIAGO asked TAVO if he can come over "if the coast is clear." TAVO replied that it was clear, that he looked but hasn't gone back outside, but he was going over. SANTIAGO told TAVO that he was parking around the corner. The GPS device on SANTIAGO's minivan revealed that he was on West Adams Street in Lowell which is around the corner from TAVO's residence at this time. I believe that the "keys to the car" is a reference to a quantity of money or drugs.

**During the Course of This Investigation, SANTIAGO has Made Numerous Trips to Brooklyn, NY To Obtain Heroin**

111.    In the past few months, SANTIAGO regularly travels to 930 59th Street, Brooklyn, New York. Based upon intercepted calls, the nature and frequency and timing of his trips there, I believe that SANTIAGO is obtaining heroin from a source of supply located at this address.

47

112.    On September 15, 2004, SANTIAGO received a telephone on Target Telephone 3 from 718-598-5109 subscribed to by Jose Perez, 12s241 39th Street, Brooklyn, New York at 10:33 p.m. The call lasted approximately 1:06 seconds. (I note that DEA was not intercepting Target Telephone 3 at this time). The following day, September 16, 2004, the GPS device on the SANTIAGO minivan indicated that SANTIAGO left his residence in Leominster at approximately 9:57 p.m. and traveled to 930 59th Street in Brooklyn, New York. Although there was no surveillance conducted of this trip, the GPS device indicated that the SANTIAGO minivan stayed at this location for approximately five hours before leaving at 2:53 a.m. and returning to SANTIAGO's Leominster residence at approximately 6:33 a.m.

113.    On September 27, 2004, the GPS device on the SANTIAGO minivan left his Leominster residence at approximately 10:20 a.m. and arrived at 930 59th Street, Brooklyn, NY at approximately 1:45 p.m. Surveillance at this location observed SANTIAGO arrive in the SANTIAGO minivan and enter the 59th Street residence. According to pen register data on Target Telephone 3, SANTIAGO called a pager, (917) 500-8132 (subscriber information is still unknown) at 1:47 p.m. and then received an incoming call at 1:49 p.m. from the same telephone number, 718-598-5109 that he had been contacted by on September 15th. (Again at this time, DEA was not intercepting Target Telephone 3). At approximately 3:00 p.m., surveillance saw SANTIAGO and an unknown Hispanic male leave the residence and enter the SANTIAGO minivan which was parked in front of the building. Prior to the two getting into the van, a gym bag was taken out of the back of the van . While SANTIAGO and the unknown male were in the SANTIAGO minivan, a taxi arrived and dropped off an unidentified Hispanic female. The unknown Hispanic male got out of the SANTIAGO minivan and paid the female's cab fare. At this time, SANTIAGO, the unidentified man and woman went into 930 59th Street. Later that day, surveillance saw unknown male and female and a young child leave the address and go to the subway that was enroute to Manhattan. Surveillance did not follow them, but they returned to this address several hours later. Surveillance of the location continued until approximately 8:30 p.m. During this time, SANTIAGO was not seen

leaving the address. The GPS device showed that SANTIAGO's minivan left Brooklyn, New York at approximately 3:00 a.m. and arrived back at his Leominster residence at approximately 6:35 a.m. According to pen register data on Target Telephone 3, SANTIAGO received an incoming call from 718-598-5109 at approximately 11:48 a.m. on September 28, 2004 and made an outgoing call to the same number at approximately 1:42 p.m. The following day, September 29th, the day before interception on Target Telephone 3 began, SANTIAGO received another incoming call form this number that lasted 2 minutes and 39 seconds.

114.    Earlier this month, SANTIAGO was again in touch with an unidentified individual at the same Brooklyn telephone number, 718-598-5109. In a October 6, 2004 call at approximately 3:26 p.m., an unidentified mall complained to SANTIAGO about SANTIAGO not calling him. In the course of this conversation, SANTIAGO asked him if he was "done with the factory job." The male indicated that he was, more or less, and that he may be leaving for Santo Domingo the following day (meaning that he was going to his drug supplier the following day) . The male asked SANTIAGO if he was going to travel and SANTIAGO said that he was going to see if he could get some vacation so he could go to Santo Domingo as well (meaning whether SANTIAGO was going to visit his supplier and SANTIAGO indicating that he was going to do so). At the end of the conversation, SANTIAGO said that he would call the caller sometime this week if he decided to go to Santo Domingo (meaning go to his supplier). Although there was no surveillance of this trip, the GPS device on SANTIAGO's minivan showed that he traveled to 930 59th Street in Brooklyn, New York on October 7, 2004 and then returning early the following morning to his residence in Leominster.   Two days later (October 8, 2004) at approximately 1:02 p.m., SANTIAGO received a telephone call from the same caller from same number, 718-598-5109. SANTIAGO asked caller if everything was fine. Caller replied that everything was fine. In the course of this conversation, SANTIAGO said that "the trip went well for him."

115.    Based on my training and experience, I know that New York City is a source city of heroin for drug-traffickers in the New England area generally and in Massachusetts in particular.

49

Moreover, the manner in which Santiago's minivan was driven to Brooklyn on each of these occasions: it was driven non-stop down to Brooklyn, New York and approximately three hours non-stop back from in the middle of the night and remained at its apparent destination for less than a day and then returns to SANTIAGO's 264 Mechanic Street residence-- combined with the fact that SANTIAGO uses only the minivan when transporting heroin to his customers makes it likely that the minivan was driven on these occasions to take delivery of and to transport back to Massachusetts a quantity of heroin for re-distribution by SANTIAGO.

116.   Earlier today (October 14, 2004), the GPS device showed that the SANTIAGO minivan drove from Massachusetts to New York.  Surveillance observed SANTIAGO arrive at 930 59th Street in Brooklyn, New York at approximately 2:00 p.m.  Yesterday, there was an intercepted call between SANTIAGO and the caller from 718-598-5109.  SANTIAGO told the caller that he would visit "early in the weekend."

## III. PROBABLE CAUSE FOR SEARCH WARRANTS FOR TARGET LOCATIONS

### DRUG TRAFFICKERS' USE OF RESIDENCES GENERALLY

117.   I have participated in the execution of numerous search warrants at the residences of drug-traffickers such as the targets of this investigation.  In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following kinds of drug-related evidence have typically been recovered:

   a.   controlled substances, such as heroin;

   b.   paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

   c.   books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

   d.   personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

   e.   cash, currency, and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys, as well as precious metals such as gold and silver, and precious gems such as diamonds and deeds to real property;

50

f.    documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills; and

g.    firearms and other dangerous weapons.

118.    In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

119.    Based upon my training, experience, participation in other narcotics investigations, and extensive discussions with other law enforcement officers experienced in narcotics and money laundering investigations, I know the following:

a.    Narcotics traffickers find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system.

b. Narcotics traffickers frequently maintain large amounts of cash and other valuable assets such as precious metal or gems on hand in order to maintain and finance their ongoing business.

c. Narcotics traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders and other documents relating to the transportation, ordering, sale and distribution of controlled substances and monetary instruments and other assets. Such documents are generally maintained where the narcotics traffickers have ready access to them, such as at their residences or other locations where they regularly conduct their narcotics business.

d. It is common for significant narcotics traffickers to hide contraband, proceeds of drug sales, records of drug transactions, weapons, ammunition, caches of drugs, large amounts of currency, financial instruments, keys for safe deposit boxes, precious metals, jewelry and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences for ready access and to conceal them from

51

law enforcement authorities.

e. When narcotics traffickers amass proceeds from the sale of controlled substances, they commonly attempt to legitimize those profits. Narcotics traffickers use various means for these purposes, including but not limited to foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts.

f. Narcotics traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, telephone numbers and/or paging numbers for their criminal associates. They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing.

g. Narcotics traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences.

h. To evade surveillance and law-enforcement tracking through Registry of Motor Vehicle Records, narcotics traffickers also frequently rent vehicles and maintain records of such rentals at their residences.

i. Narcotics traffickers usually keep paraphernalia for packaging, cutting, weighing and distributing controlled substances. These paraphernalia include but are not limited to scales and packaging materials.

j. Narcotics traffickers maintain many associated apartments from which they conduct their business, such as mills or "stash" houses. Narcotics traffickers frequently maintain records and other documents that evidence rental or lease agreements for such apartments. These documents constitute evidence of the association of the various apartments, which, itself, is a tool of the narcotics conspiracy. Drug traffickers frequently maintain such records in their residences.

k. Narcotics traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, containers, safe-deposit boxes and other instruments, which are further secured by combination and/or key locks of various kinds.

l. Narcotics traffickers frequently build "stash" places within their residences or other

52

locations in order to store illicit narcotics substances as well as the items described above.

m. Narcotics traffickers frequently hire motor vehicles from rental companies and car services to transport narcotics and elude surveillance.

n. Narcotics traffickers frequently use fronts through which they are able to declare a source of employment and legitimate income, obtain credit, provide company names and addresses in which to register real property and other assets, launder narcotics proceeds, and accept or make shipments of narcotics and/or narcotics proceeds.

o. Courts have recognized that unexplained wealth is probative evidence of crimes motivated at least in part by greed, in particular, trafficking in controlled substances.

120. Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth hereinafter, I believe that SANTIAGO, TAVO, SANCHEZ and RIVERA, like many drug traffickers, have used their residences in furtherance of their drug trafficking activities, and that evidence regarding those activities, including, but not limited to, cash, drugs, drug ledgers, and other tools of the drug trade will be found in each of their residences.

### DRUG TRAFFICKERS' USE OF "STASH LOCATIONS" GENERALLY

121. It has been my experience that drug traffickers use "stash locations" for their drugs, in order to avoid keeping large quantities of the drugs in their residences. Stash locations also provide some measure of security for drug traffickers, who are concerned about being robbed. Stash locations provide privacy so that traffickers can break down and package the drugs, often with assistance from associates, at a location away from their homes and families. A stash location also provides some anonymity for the delivery of bulk drugs; in this way, a drug trafficker can receive a shipment of drugs without letting the courier (or other members of the supply organization) know where he or she lives.

### THE TARGET LOCATIONS

122. Recent interceptions (and/or surveillance conducted in relation to some of these interceptions) reveal, among other things, that SANTIAGO is still communicating and/or meeting

with numerous heroin customers to provide heroin to them; that TAVO is still allowing SANTIAGO to meet at his residence to meet with heroin customers; and that, today, SANTIAGO has traveled to Brooklyn, New York in what is believed to be, based upon his past trips there and intercepted calls regarding same, a trip to obtain heroin from a source of supply.

### RIVERA'S 235 Eighteenth Street residence

123.    As discussed above, RIVERA resides at this location and has been surveilled on numerous occasions meeting with SANTIAGO in the parking lot of this residence in what are believed to be deliveries of heroin to RIVERA by SANTIAGO and/or deliveries of money to SANTIAGO by RIVERA. On several occasions, RIVERA was observed returning to his residence after these meetings. Most recently, on October 13, 2004, there was a page of "423-14" to the Target Pager at 1:17 p.m. (the first three numbers are the first three numbers of RIVERA's telephone number and I believe that 14 was a reference to 14 10-gram fingers of heroin). At 1:21 p.m., there was an intercepted call between RIVERA and SANTIAGO in which SANTIAGO was confirming this order and they agreed to meet later.

124.    At around 9:55 p.m., surveillance observed the SANTIAGO minivan showed that SANTIAGO's minivan traveled to RIVERA's 235 Eighteenth Street residence. Surveillance at RIVERA's residence observed SANTIAGO arrive in SANTIAGO's minivan and he went into RIVERA's 235 Eighteenth Street residence. SANTIAGO remained inside for approximately two minutes and then returned to the SANTIAGO minivan and then departed the area.[9] Based upon the interceptions and surveillance, I believe that SANTIAGO delivered 14 fingers of heroin to RIVERA on this occasion.

125.    Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the 235 Eighteenth Street residence

---

[9]Although DEA had received information earlier in this investigation from a confidential informant that RIVERA had used another residential location as a stash location and then later had used a motel room in Tewksbury, Massachusetts as a stash location, the more recent surveillance of RIVERA reveals that he is receiving heroin deliveries from SANTIAGO at this residence.

presently contain the items set forth in Attachment B-1 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that RIVERA keeps, among other things, drug proceeds in this residence, as well as narcotics and documentary evidence reflecting past and present narcotics transactions between and among the other targets of this investigation.

### SANTIAGO's 264 Mechanic Street residence

126. As discussed above, SANTIAGO has traveled to and from this location to make deliveries of heroin to customer and/or to collect money for heroin from them on numerous occasions. For example, recently on October 9, 2004, surveillance observed SANTIAGO travel in Santiago minivan from SANTIAGO's 264 Mechanic Street, Leominster address to TAVO's 212 Wilder Street, Lowell residence for AGOSTO who had ordered heroin in previously intercepted calls that day. Today (October 14, 2004), SANTIAGO traveled directly from this residence to 930 59th Street, Brooklyn, the location from which there is probable cause to believe SANTIAGO is receiving heroin.

127. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the 264 Mechanic Street residence presently contain the items set forth in Attachment B-2 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that SANTIAGO keeps, among other things, drug proceeds in the this residence, as well as narcotics and documentary evidence reflecting past and present narcotics transactions between and among the other targets of this investigation.

### SANCHEZ'S 270 Fairmount Street residence

128. On numerous occasions, surveillance has observed (or the GPS device has shown) that SANTIAGO has traveled to SANCHEZ's 270 Fairmount Street residence after intercepted calls and pages indicating that SANCHEZ was ordering a quantity of heroin from SANTIAGO. Most recently, on October 7, 2004 surveillance observed SANTIAGO travel to SANCHEZ's 270 Fairmount Street residence after a series of intercepted calls about arranging to meet and an intercepted page ("250", referring to a 250-gram quantity of heroin) between SANTIAGO and SANCHEZ. On this occasion, as in past occasions, there is probable cause to believe that SANCHEZ ordered a quantity of heroin and that SANTIAGO delivered it to him at SANCHEZ's 270 Fairmount Street residence.

129. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the 264 Mechanic Street residence presently contain the items set forth in Attachment B-3 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that SANCHEZ keeps, among other things, drug proceeds in the this residence, as well as narcotics and documentary evidence reflecting past and present narcotics transactions between and among the other targets of this investigation.

### Mini-Self Storage, 3 Foundry Street, Lowell, Massachusetts

130. On numerous occasions, surveillance has observed SANTIAGO and TORREZ meet at this location after intercepted calls and/or pages in which TORREZ, in coded language, ordered a quantity of heroin. Most recently, on October 9, 2004, there were intercepted calls between SANTIAGO and TORREZ about meeting the next day. Later that day, however, the GPS device on SANTIAGO's minivan revealed that it had traveled to the Mini Self-Storage location and had remained there approximately seven minutes.

56

131. As discussed above, Mini Self Storage is a location that TORREZ has recently been using as a stash location for items related to his drug trade. I and other law enforcement agents have conducted surveillance at this location on numerous occasions and have observed SANTIAGO arrive and depart from this location on numerous occasions and meet with certain customers there.

132. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at Mini-Self Storage presently contain the items set forth in Attachment B-5 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that SANTIAGO keeps, among other things, drug proceeds in the this residence, as well as narcotics and documentary evidence reflecting past and present narcotics transactions between and among the other targets of this investigation.

### TAVO'S 212 Wilder Street residence

133. As discussed above in Paragraphs 107 through 110, surveillance and intercepted calls between SANTIAGO and TAVO show that there is probable cause to believe that SANTIAGO has left money and/or drugs at TAVO's residence and that TAVO has allowed SANTIAGO to meet with various customers to deliver heroin. On the most recent occasion on October 9, 2004 (as discussed further above in paragraph 82), SANTIAGO arranged to meet with AGOSTO at TAVO's residence for what there is probable cause to believe was a heroin transaction.

134. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the 212 Wilder Street residence presently contain the items set forth in Attachment B-6 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that TAVO keeps, among other things, drug proceeds in

the this residence, as well as narcotics and documentary evidence reflecting past and present narcotics transactions between and among the other targets of this investigation.

### SANTIAGO'S minivan

135.    As discussed above, SANTIAGO has used the SANTIAGO minivan on many occasions to make deliveries of heroin to customers, to retrieve heroin from a source of supply in Brooklyn, New York and otherwise to facilitate his heroin trafficking. In fact, he traveled to Brooklyn, New York today (October 14, 2004) in the SANTIAGO minivan to the location from which, based upon the investigation to date, he will retrieve a supply of heroin.

136.    Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the Santiago minivan presently contain the items set forth in Attachment B-7 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that SANTIAGO keeps, among other things, drugs, money, and documents and papers relating to his drug customers and his source of supply and relating to his travel to New York to his source of supply.

## IV. CONCLUSION

137.    Based on all the foregoing, I submit there is probable cause to believe **JULIO CARRION SANTIAGO, a/k/a "MACHO," PEDRO ALBERTO MIRANDA, a/k/a "TAVO," REYNALDO RIVERA, a/k/a "REY", JOSE RODRIGUEZ, ENRIQUE AGOSTO, JOSE TORRADO, CARLOS SANCHEZ, a/k/a "CARLITOS," LUIS R. SANCHEZ, a/k/a "PITO," EDWIN TORREZ, a/k/a "COQUI, a/k/a TIM," ZULEIMA REYES, a/k/a "LINDA," and SANTIAGO ARROYO** have conspired to possess with intent to distribute and to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §846 and that evidence of the commission of this

criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846 will be found at the Target Locations.

Dated this  day of October __, 2004.

CALICE COUCHMAN
Special Agent, United States
Drug Enforcement Administration

Sworn to and subscribed to before me in Boston, Massachusetts, this day of October __, 2004.

ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE